IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WIPRO, LLC,<br><br>   Plaintiff,<br><br> v.<br><br>FIRST DATA GOVERNMENT<br>SOLUTIONS, LP,<br><br>   Defendant. | Case No. 4:22-cv-03116-JMG-MDN<br><br>FIRST AMENDED COMPLAINT<br>(Jury Trial Demanded) |

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), which permits the Plaintiff, Wipro, LLC ("Wipro"), to amend its Complaint as a matter of course before 21 days after service of a responsive pleading or motion, Wipro states its First Amended Complaint against First Data Government Solutions, LP ("First Data") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Wipro is a limited liability company organized and existing under the law of Delaware, with its principal place of business in New Jersey. Wipro's sole member, Wipro Limited, is a corporation organized and existing under the law of India, with its principal place of business in the United States in New Jersey.

2. First Data is a limited partnership with its principal place of business in a state other than Nebraska; on information and belief its sole partner is a Delaware corporation with its principal place of business in Wisconsin.

3. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332, in that it is an action between a citizen of a state or states and a

1

citizen or subject of a foreign state, and the matter in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.     Venue in this District is proper because a substantial portion of the events or omissions giving rise to the claim occurred in Nebraska.

## FACTUAL ALLEGATIONS

### Wipro, the State, and the Project

5.     Beginning in 2014, Wipro had a contract with the State of Nebraska ("State") to replace the functionality of the State's Medicaid Eligibility and Enrollment Solution with computer software that met certain criteria established by the federal government (the "Project").  The contract had a value to Wipro into the tens of millions of dollars.

6.     The Project was vast and complex, and it required close coordination with the State, whose numerous and disparate records of the social services it provides needed to be harmonized into one authoritative record, known as the Master Client Index.

7.     For the Project to progress, knowledgeable representatives of the State had to assist Wipro in creating the Master Client Index and other aspects of the Project.

8.     The State could not hold on to its people, however, and had to "augment" its staff with a less-knowledgeable contractor.

### First Data: Independent Verification and Validation

9.     During all relevant periods, First Data served as the Independent Verification and Validation ("IV&V") contractor for the Project. For the period

2

between 2016 and 2019 alone, First Data provided IV&V services through a contract in which First Data was to receive in excess of $15 million.

10.     As its name suggests, an IV&V contractor is to be independent and monitor the matters under its supervision objectively for the benefit of, among others, the federal government and the public.

**First Data's Duty of Independence**

11.     In its proposal to the State to provide IV&V services, First Data recognized that the "First Data IV&V Team's reports [to the federal government] must be independent and objective."

12.     Pursuant to 45 CFR § 95.626, IV&V functions must be "conducted by an entity that is independent from the State."

13.     First Data accepted this responsibility in its proposal to the State for IV&V services.

14.     In its proposal to provide IV&V services to the State, First Data acknowledged that IV&V "review reports" must be "free of personal or professional bias, posturing, or gold plating."

15.     In addition, First Data acknowledged that it must have "managerial independence" from the State, so that it could "deliver findings and recommendations to state and federal executive leadership and management without restriction, fear of retaliation, or coercion."

16.     First Data recognized its role was to answer two questions that "typify" the IV&V function: "Are we building the thing right," and "Are we building

3

the right thing?"  By contrast, First Data did not claim that expanding or upselling its relationship with the State was a function of IV&V.

17.    Generally accepted government auditing standards ("GAGAS") define their responsibility of IV&V contractors such as First Data.

18.    As published by the federal government, GAGAS requires, among other things, that audit organizations such as First Data maintain its "independence."

19.    Section 3.19 of GAGAS provides that "auditors and audit organizations should avoid situations that could lead reasonable and informed third parties to conclude that the auditors and audit organizations are not independent and thus are not capable of exercising objective and impartial judgment on all issues associated with conducting the engagement and reporting on the work."

20.    Section 3.21 of GAGAS provides that independence requires both independence of mind and independence in appearance.  This requires, in turn, that an IV&V engagement must not be "affected by influences that compromise professional judgment," and must be free of "circumstances that would cause a reasonable and informed third party to reasonably conclude that the integrity, objectivity, or professional skepticism of an audit organization or member of the engagement team had been compromised."

## First Data Plans to "Expand and Upsell" the State

21.    In April 2018, Regina Blazek was the head of the IV&V team for the Project.  She replaced, and reported to, Alan Ashurst at First Data.  Ashurst in turn reported to Crystal Cooper.

22.    Cooper's duties, among other things, included securing and expanding government relations business for First Data in the region that includes Nebraska.  Throughout the period described herein, First Data, through Cooper, Ashurst, Blazek and others, manipulated the actions of IV&V in order to increase the State's reliance on First Data and secure future business for First Data, at the expense of First Data's independence and Wipro's contractual relationship with the State.

23.    Specifically, in an April 2018 document entitled "Phase 3 Opportunity – Executive Briefing," Cooper and First Data recognized the possibility of receiving a lucrative contract for the next phase of the Medicaid Eligibility and Enrollment System.

24.    At the same time, Cooper's subordinate Ashurst was concerned about what appeared to be the troubled relationship between the State and First Data.  As of April 16, 2018, Ashurst was detailing to his colleagues conversations with representatives of the State, in which the State indicated displeasure with the quality of First Data's services.  In Blazek's view, the relationship between First Data and the State was "failing."

25.    Accordingly, by no later than April 2018, First Data was motivated to demonstrate its importance to the State.

5

26.     Simultaneously, First Data, under the direction of Cooper, was working under a "Nebraska Account Plan," whose points included a demand to "expand and upsell" services to the State of Nebraska; to "escalate early" any issues; and "expand breadth and depth" of the relationship between First Data and the State.

27.     In furtherance of its sales objectives, First Data intentionally targeted obtaining the confidence of Matthew Van Patton, who had recently been named Director of the Nebraska Department of Health and Human Services, the State agency in charge of the Project.

28.     Indeed, when First Data representatives were able to influence Van Patton's actions, they were praised by Cooper and Ashurst.  For example, on June 6, 2018, when Van Patton acted on one of First Data's recommendations, Cooper wrote to her team "The new director told them to call us.  It's working!"

29.     First Data's desire to "expand and upsell" the State by winning the personal confidence of the Director of HHS led First Data to abandon its independence as the IV&V contractor in violation of industry standards.

**First Data Begins to Plant "Seeds of Doubt" in Wipro's Relationship with the State**

30.     First Data's method for winning the confidence of Van Patton was undermining the work of Wipro.  In April 2018, Blazek reported to her superiors (but not to the State) that another consultant on the Project had advised her "this project is still so out of control" and "Wipro needs more people with

experience … they are overcommitted and under delivering."  Blazek added "we know that of course."

31.    But First Data was not objectively reporting the facts to the State. In an April 2018 report, First Data originally intended to communicate to the State the "conversion to Cúram data model is difficult," referring to the software at the base of the Project that all parties were working together to adapt to the State's needs.  By May 2018, when this report was delivered, one of Cooper's superiors had instructed that this be removed, stating "why would we tell the client … that Cúram is difficult to implement?"

32.    By the second quarter of 2018, the State and Wipro had agreed that they would take a new approach to the completion of the Project, owing to circumstances that had not been foreseen.  First Data recognized that this "new approach" was agreed upon by the parties on June 22, 2018.  The new approach was to be reflected in an amendment to the contract between the State and Wipro, Amendment No. 5.  Wipro began working in good faith on the work called for in Amendment No. 5, with the knowledge of the State and of IV&V.  While Amendment No. 5 was being negotiated, Wipro was not being paid for the work that Amendment No. 5 called for.

33.    Although First Data recognized in writing that the State and Wipro had agreed on a new approach to completing the project, and had agreed to amend the contract accordingly, First Data immediately began to sabotage the State's commitment to Wipro.

34.     While First Data was ostensibly participating in the development of the "new approach" to which the State and Wipro had agreed, it was actively undermining the relationship between Wipro and the State.  During the second quarter of 2018, First Data was laying the groundwork for the displacement of Wipro, actively working on a project to determine the pricing for Cúram, the software at the heart of the Project, independent of Wipro's relationship with the State.  The purpose of this initiative was to prepare the State to attempt to duck its contractual obligations to Wipro by terminating Wipro and obtain an independent license to Cúram.

35.     When the State and Wipro agreed to a new approach to the Project in June 2018, they agreed to use an industry-standard software development and collaboration tool called Rational Team Concert (RTC).  RTC's purpose is to assist in communication between developers and project owners, as well as assess the progress of software development.

36.     In a conversation with the State she documented on June 27, 2018, Blazek triumphantly advised her superiors that "I believe I was successful… in planting seeds of doubt around moving forward with the RTC tool."

**First Data Says the Project is On Track, Agrees to Sabotage Wipro Anyway**

37.     While sowing these seeds of doubt with the State, Blazek was simultaneously informing Wipro and the federal government that the project was on track.  Specifically, on August 7, 2018, she delivered to Wipro, the federal government and others First Data's "IV&V Monthly Status Report for July," which, using a traffic light metaphor, said that the project was in "green" status

8

meaning there were no major problems with the Project. In the same report, First Data acknowledged again that the State and Wipro were in the process of amending their contract.

38.     Literally minutes after delivering that report, Blazek met with the Director Van Patton and representatives of Wipro to discuss the Project. At that meeting, the director badgered Wipro into stating how much of the "MAGI" portion of the project was complete. The Wipro project manager informally estimated the degree of completeness at 80%. Shortly thereafter, the director excused Wipro representatives from the meeting and had a confidential meeting with Blazek.

39.     During this confidential August 7 meeting, the State, through Van Patton, and First Data, through Blazek, agreed in effect that First Data would abandon its independence as IV&V and provide Van Patton contrived evidence to cancel the Project and renege on the State's commitment to amend the contract with Wipro. Blazek describes the meeting on August 7th without Wipro present as the director's expression of "his willingness and dare I say plan to part with Wipro."

40.     The director expressed to First Data that he was concerned about the State being sued if it went through with the amendment that it had agreed with Wipro to execute. In this way, Director Van Patton made his wish clear that First Data devise a test that Wipro could not pass. Because Blazek's instructions from Cooper and others were to "expand and upsell" the relationship with Nebraska, she agreed.

9

41.     During that meeting, Blazek agreed with the director to "create a report" evaluating the accuracy of the estimate that Wipro had given minutes before.  The report she agreed to "create" had no basis in the contract between the State and Wipro, and it agreed to test supposed conditions that no party had agreed to meet.

42.     Having found only hours before that the project was in "green" status, Blazek convened a meeting of IV&V team members for the purpose of creating a report, outside the cycle of other reports provided by IV&V, for the specific purpose of fulfilling the director's wishes, in contravention of their obligation to be independent, but in service of First Data's goal to "upsell" the State. The sole purpose of this test was to examine the truthfulness of the impromptu verbal estimate Wipro had given Van Patton.

43.     First Data saw this subterfuge as a victory.  Cooper directly praised Blazek, saying "We are becoming their trusted advisor.  Nice job."  Blazek wrote back, characterizing her subterfuge as having "won the day," referring to her use of a "mask" and "wardrobe" in the style of "Kabuki," the ornate, symbolic style of Japanese theatre, to persuade Van Patton toward this course of action.

44.     On August 14, 2018, without advising Wipro that the director had stated he would terminate Wipro if it could not demonstrate that MAGI was 80% complete, Blazek contacted the manager of Wipro's team.  She asked for information about the 80% estimate.

45.     Wipro provided this information.  It effectively justified Wipro's assertion in the meeting with Van Patton by showing that from a testing

10

perspective, 80% of the objectives of the MAGI portion of the project had been realized.  Subsequently, Wipro made the code base available for review.  Wipro's manager advised Blazek, "please let me know if you need additional information." Blazek never asked for further information.

46.     In a later email to her superiors, Blazek admitted that her email was a trap for the unwary, in that it was apparently Wipro's first and only opportunity to explain its 80% estimate to First Data, failing which the director, First Data knew, would terminate Wipro.

47.     Specifically, Blazek admitted she was uninterested in permitting Wipro to provide evidence of its informal completeness evidence:

> "I sent Michelle the request for the previous test and control documents on 8-14-2018.  And her response is the real lynch pin [*sic*] to their response.  I feel that email thread, more than anything, will indict their response if it includes that there was an alternate place for evidence.  If such place existed at the time, why did they not inform us when we asked."

48.     At the time she wrote this, Blazek knew that an email is not evidence of a project's completeness.  Blazek has acknowledged in sworn testimony that the project artifacts (agreed-upon documents, code, and communication) are the definitive evidence defining a project's progress.  Her trap email, and the report that considered that email a "lynch pin" (sic) were composed in bad faith.

49.     While drafting the report that First Data knew would effectively end Wipro's relationship with the State, Blazek made a concerted effort to download

11

all of the code that Wipro had created and placed in the RTC tool, even though she and First Data had actively attempted to undermine the State's confidence in it.

50. During her efforts to download the code, Blazek kept Bo Botelho, the Chief Operating Officer of the State Department of Health and Human Services, fully apprised of her efforts. Botello advised Blazek to secure the code "if at all possible."

**First Data Publishes Contrived "Report," Refuses to Discuss It**

51. Only after First Data obtained the code, Blazek published First Data's estimate that the MAGI portion of the Project was 0% complete.

52. The work of First Data purported to justify the State's termination of the contract and seizure of the code for which it had not fully paid. Based on First Data's sham test, the State terminated Wipro and issued press releases critical of its efforts.

53. In a further effort to burnish its relationship with the State at the cost of their independence, First Data agreed that it would give Wipro no opportunity to understand the basis for the report. Specifically, when asked for a telephone conference by Wipro, Cooper told her colleagues "to take the call and not talk just listen and then schedule another call and put parameters around it." Ashurst agreed that this "silent treatment" was a good idea: "Oh good I like it," he wrote

54. Cooper directed Blazek and others that the call with Wipro would be confined to "asking them what they want to achieve then if they want a follow on

12

call we can ask for the questions in writing."  In other words, Cooper directly instructed First Data not to be objective, but to refuse to answer questions on the report the State had effectively requested that it write.

55.    First Data followed this script.  On October 18, 2018, Wipro, who had been blindsided by a report they did not know was coming, on a standard they did not know existed, tried to ask First Data the basis for the decision. First Data refused to respond.  By this point, First Data had abandoned any pretense of independence, and was carrying out Van Patton's will to get the project terminated without regard to the law or the facts.

56.    After carrying out the director's wishes in this way, however, First Data began to recognize that its simplistic approach – torpedoing the project by blaming Wipro - had sacrificed its independence.  Specifically:

A. Blazek recognized, in an October 3rd email to Cooper, that another consultant (JS3) had "culpability within the current failure of the Wipro contract."  She suggested, that "If I were Wipro that is where I would be poking my stick."

B. Blazek further indicated to her superiors that a representative of the State and JS3 had had an inappropriate personal relationship, which compromised the ability of each of them to oversee the Wipro contract. First Data never reported this fact to the State or the federal government.

13

C. Cooper recognized that "Director Van Patton [is] very concerned about the JS3 contract and the risks it opens them to going forward in the event of litigation…"

D. On October 8, 2018, Ashurst recognized that the director's August 7, 2018 directive to First Data to find a basis to terminate the contract was inadequately documented: "In retrospect [we] should have parroted back to [Van Patton] for confirmation and documentation."

E. Ashurst directed that further documentation of First Data's hatchet job on Wipro should be quite limited:  First Data representatives should, he ordered, "talk on the phone rather than via email if more detail is necessary, this continues to be a very sensitive topic."

57.    After doing the State's bidding, Blazek has characterized her role in helping the State to terminate its contract with Wipro as an "achievement," and publicly claims to have "restored the failing client relationship" between First Data and the State.  Blazek's public declarations on the point do not mention objectivity, independence, or fairness.

58.    Blazek's "achievement" resulted in personal gain; the State later recruited her to work for the State directly.

14

## CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE

## ECONOMIC ADVANTAGE

59.     At all relevant times, First Data was well aware of the contract between Wipro and the State, and the prospective economic advantage to Wipro represented by Amendment No. 5, which had been agreed to.

60.     First Data interfered with that relationship by sacrificing its independence, carrying out the director's wishes, without regard to any provision of the contract or industry standard for IV&V.  Specifically:

A.  First Data improvised an impromptu test that it knew Wipro would fail and be used as a pretext for terminating Wipro;

B.  First Data concealed from Wipro the fact that it had been directed to assess Wipro's extemporaneous 80% completion estimate in its meeting with the director, failing which Wipro would be terminated;

C.  Knowing that Wipro had just appointed a new project manager, First Data concealed from Wipro that Wipro had only one opportunity to needlessly prove its informal 80% estimate;

D.  First Data laid the groundwork for the termination of Wipro by secretly working on a plan to separately license Cúram; and

E.  After delivering the report requested by Van Patton, refusing to answer any questions about it.

61.     First Data's motives in doing the foregoing were wrongful.  Rather than preserve and protect its promised independence, First Data elected instead

to "expand and upsell" its relationship with Nebraska, as Cooper had directed. Because the director told Blazek as much, First Data knew that creating a false report that condemned Wipro for not meeting a non-existent standard would result in the termination of Wipro.

62.     As a direct and proximate result of First Data's acts, Wipro has been damaged in the amount of its lost contractual revenue with the State, and in the amount of its prospective economic advantage represented by Amendment No. 5.

63.     Absent First Data's intentional and tortious interference, Wipro would have successfully completed the contract and realized the economic advantage of both the Contract and the proposed Amendment No. 5.

**RELIEF REQUESTED**

64.     Wipro requests damages in an amount to be proven at trial, currently estimated in excess of $40 million.

65.     Wipro requests such further relief as may be available at law.

**JURY DEMAND AND REQUEST FOR PLACE OF TRIAL**

66.     Wipro requests trial by jury of all issues so triable.

67.     Pursuant to NECivR 40.1, Wipro requests trial at Lincoln.

DATED this 20th day of July, 2022.

WIPRO, LLC, Plaintiff,

By:   s/ Richard P. Jeffries
Richard P. Jeffries #20089
Andre R. Barry # 22505
CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
Sterling Ridge
12910 Pierce Street, Suite 200
Omaha, NE 68144
Telephone: (402) 397-1700
Facsimile: (402) 397-1806
rickjeffries@clinewilliams.com
abarry@clinewilliams.com

4884-5871-2354, v. 8

17