IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WIPRO, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FIRST DATA GOVERNMENT SOLUTIONS, LP,<br><br>　　　　Defendant. | Case No. 4:22-cv-03116-JMG-MDN |

**PLAINTIFF WIPRO, LLC'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

　　　　　　　　　　　　　　　　　Respectfully submitted:

　　　　　　　　　　　　　　　　　Richard P. Jeffries, #20089
　　　　　　　　　　　　　　　　　Andre R. Barry, #22505
　　　　　　　　　　　　　　　　　Nathan D. Clark, #25857
　　　　　　　　　　　　　　　　　CLINE WILLIAMS WRIGHT
　　　　　　　　　　　　　　　　　　JOHNSON & OLDFATHER, L.L.P.
　　　　　　　　　　　　　　　　　Sterling Ridge
　　　　　　　　　　　　　　　　　12910 Pierce Street, Suite 200
　　　　　　　　　　　　　　　　　Omaha, Nebraska 68144
　　　　　　　　　　　　　　　　　T: (402) 397-1700
　　　　　　　　　　　　　　　　　F: (402) 397-1806
　　　　　　　　　　　　　　　　　rickjeffries@clinewilliams.com
　　　　　　　　　　　　　　　　　abarry@clinewilliams.com
　　　　　　　　　　　　　　　　　nclark@clinewilliams.com

September 15, 2022

Plaintiff Wipro, LLC, ("Wipro") respectfully submits this Brief in Opposition to Defendant's Motion to Dismiss. [Filing No. 17.]

## INTRODUCTION

As alleged in the Amended Compliant, First Data was a third-party auditor tasked with reporting on the progress of a software-development contract between the State of Nebraska and Wipro. In that role, First Data had a duty to assess the progress of that project with professional and objective independence. First Data breached that duty, embarking on a months-long campaign to undermine Wipro's relationship with the State for First Data's own gain. That campaign culminated in First Data's knowing fabrication of a baseless report concluding that the project was, after four years, at 0% completion. Having already purposefully sabotaged Wipro's relationship with the State, such that the State now sought a pretext to prematurely end its relationship with Wipro, First Data offered up its baseless report to provide the State that cover. In short, First Data wrongfully breached its duty of independence to erode and ultimately end Wipro's present and future contractual interests with the State.

First Data does not deny that it had a duty of independence or that it breached that duty. Instead, First Data seeks to mischaracterize Nebraska law and the factual allegations of the Amended Complaint. As discussed below, however, the law and the facts alleged in the Amended Complaint squarely support Wipro's claim of tortious interference. The Motion to Dismiss should be denied.

**BACKGROUND**

This suit arises from First Data's conduct while it served as an Independent Verification and Validation (IV&V) contractor for the State of Nebraska. [First Am. Compl. ¶¶ 5–10, Filing No. 11.] Beginning in 2014, Wipro performed a contract with the State to provide updated computer software to replace the functionality of the State's Medicaid Eligibility and Enrollment Solution ("the Project"). [*Id.* ¶ 5.] First Data was charged with supplying independent and objective reports to the State and the federal government regarding the progress of the Project. [*Id.* ¶ 11.] First Data was to receive $15 million for its IV&V services from 2016 to 2019 alone. [*Id.* ¶ 9.]

In First Data's proposal to offer IV&V services to the State, First Data acknowledged that it must have "managerial independence" and its reports must be free of "personal and professional bias." [*Id.* ¶¶ 14–15.] First Data's admitted duty of independence—which did not include advancing its own interests through expanding or "upselling" its business relationship with the State to the detriment of Wipro—is not only a matter of First Data's contractual duties but also its agreement to follow generally accepted standards of government auditing. [*Id.* ¶¶ 16–20.]

By April of 2018, First Data employees indicated that First Data's relationship with the State had soured. [*Id.* ¶ 24.] This concerned First Data, who sought to secure future business with the State, including lucrative contracts for the next phase of the Project, by demonstrating its importance to the State. [*Id.* ¶¶ 21–29.] Accordingly, First Data developed a plan to boost its

3

sales, including an effort to "expand and upsell" services to the State. [*Id.* ¶ 26.] In pursuit of this objective, and to salvage its relationship with the State, First Data sought to obtain the trust of the new Director of the Nebraska Department of Health and Human Services, Matthew Van Patton ("Van Patton"), by undermining Wipro's work. [*Id.* ¶¶ 27–30.] In First Data's own words, it sought to "plant[] seeds of doubt" with the State about Wipro's performance. [*Id.* ¶ 36.]

First Data's campaign to earn more business from the State at Wipro's expense necessarily entailed abandoning its duty of independence. [*Id.* ¶¶ 30–36.] First Data's internal communications recognized that the Project was understaffed, that the software platform for the Project—IBM's "Cúram"—was "difficult to implement," and that the State and Wipro had agreed in the second quarter of 2018 to a "new approach" to complete the Project. [*Id.* ¶¶ 30–32.] Yet rather than fulfill its duty of independence by objectively reporting on the Project, First Data used these circumstances to sabotage the State's commitment to Wipro, advancing the State's interests and thereby its own. [*Id.* ¶¶ 33–36.] For example, First Data sought to enable the State to obtain an independent license to Cúram, actively undermining Wipro's interests while simultaneously participating in the switch to the new approach. [*Id.* ¶ 34.] As another example, First Data trumpeted its success in "planting seeds of doubt" with the State about a software development tool the State and Wipro had already agreed to use as part of that new approach. [*Id.* ¶¶ 35–36.]

4

First Data's efforts to undermine Wipro were realized on August 7th, 2018. Just minutes after First Data delivered a report to Wipro and the federal government that the project was on track, First Data met with the State to discuss a plan to terminate the State's relationship with Wipro. [*Id.* ¶¶ 37–38.] That plan involved concocting a test using criteria unmoored from the agreed-upon standards and milestones governing the Project to create a false impression of Wipro's progress and justify the State's early termination of its contract with Wipro. [*Id.* ¶¶ 38–41.] After the meeting, First Data's head of IV&V, Regina Blazek, celebrated Van Patton's "willingness and dare I say plan to part with Wipro." [*Id.*] Blazek acknowledged that this outcome was First Data's goal, reporting that she had "won the day" by using "Kabuki"—*i.e.* artifice and posturing—to persuade Van Patton to that course of action. [*Id.* ¶ 43.] That plan culminated with First Data knowingly imposing arbitrary standards to estimate that Wipro's work—performed hand-in-hand with the State for four years—was 0% complete. [*Id.* ¶¶ 44–51.]

After convincing the State to proceed with terminating its relationship with Wipro, First Data then collaborated with the State in fulfilling that design. It agreed to give Wipro no opportunity to challenge First Data's report, while at the same time recognizing and expressing concern about the exposure to liability its conduct had created. [*Id.* ¶¶ 53–56.] Internally, First Data nevertheless congratulated itself on its "achievement", and Blazek herself was later hired by the State. [*Id.* ¶¶ 57–58.]

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, Wipro's Complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet the plausibility standard, a plaintiff must "plead [ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not require detailed factual allegations, but it demands more than "an unadorned accusation." *Iqbal*, 556 U.S. at 678. All well-pleaded factual allegations are accepted as true, and all reasonable inferences are construed in the nonmoving party's favor. *Vigeant v. Meek*, 953 F.3d 1022, 1024 (8th Cir. 2020).

## ARGUMENT

The elements of tortious interference with a business relationship or expectation are—

> (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

*Huff v. Swartz*, 258 Neb. 820, 825, 606 N.W.2d 461, 466 (2000). First Data argues that Wipro failed to allege three elements of its claims for tortious interference: a breach of contract, causation, and a valid expectancy in future business with the state. These arguments rely on mischaracterizing Wipro's pleadings and Nebraska law.

### 1. Breach of contract is not an essential element of a claim for tortious interference.

First, First Data contends that Wipro failed to allege a breach of contract, and therefore, Wipro has not alleged an essential element of its claim for tortious interference with its business relationship or expectancy. First Data's legal premise is wrong, as its own citation shows: "'One of the basic elements of tortious interference requires an intentional act that *induces* or *causes* a breach **or termination** of the relationship or expectancy.' *Denali Real Est., LLC v. Denali Custom Builders, Inc.*, 302 Neb. 984, 1004 (2019)". [Def.'s Br. at 4 (third emphasis added), Filing No. 18.] Termination rather than breach of a contractual relationship, alleged by Wipro at paragraph 52 of its Amended Complaint, is sufficient.

Indeed, a tortious interference claim does not even require a contract, only a "relationship". *See Huff*, 258 Neb. at 826, 606 N.W.2d at 467 (holding that a third person may be subject to liability for tortious interference with an at-will employment relationship); *see also* Restatement (Second) of Torts § 766 comment g (1979) (though a contract may be terminable at will, "[u]ntil he has so terminated it, the contract is valid and subsisting, and the defendant may not improperly interfere with it"). First Data's insistence that Nebraska law requires a breach by a third party for a tortious interference claim is baseless.

The only authority provided by First Data for its argument is dicta from *Pettit v. Paxton,* 255 Neb. 279, 287 N.W.2d 604 (1998). It is true, as Defendant points out, that the case states: "[W]hen the defendant's interference is directed

7

toward the third party, with whom the plaintiff has contracted, and the interference did not cause the third party to breach the contract, it is difficult to conceive how the plaintiff would prove causation." *Id.* at 288, 583 N.W.2d at 610. But that is because breach, as opposed to termination, was the theory advanced by the plaintiffs in that case. *Id.* at 285, 583 N.W.2d at 609. The Court's focus in that paragraph was on causation, not on limiting a tortious interference claim to breach alone. This is apparent from the numerous descriptions of a tortious interference claim in that opinion as requiring breach *or termination* of a relationship. *Id.* at 280, 286, 287 N.W.2d at 606, 609.

Whether the agreement between Wipro and the State is styled a contract or business relationship or expectancy, the State terminated it. Wipro has alleged as much in the Complaint. [First Am. Compl. ¶ 52.] Accordingly, Wipro's allegation that First Data's interference caused the termination of its business relationship with the State is sufficient to satisfy this element.

### 2. **Wipro alleged that First Data caused the State to terminate its relationship with Wipro.**

Second, First Data argues that Wipro does not allege First Data induced or caused the State to terminate its relationship with Wipro. First Data contends that Wipro's allegations show that First Data acted "at the State's direction," not that First Data's actions led the State to terminate its relationship with Wipro. [Filing No. 18 at 8.] As explained below, this argument ignores (a) Wipro's allegations relating to First Data's conduct prior to August 7, 2018, and (b) the State's reliance on First Data's report to terminate the relationship.

8

To avoid dismissal, Wipro must plausibly allege "that the interference caused the harm sustained." *Huff*, 258 Neb. at 825, 606 N.W.2d at 466. And if "multiple causes act to produce a single injury," courts apply the "substantial factor" test as part of the causation standard. *Reimer v. Surgical Servs. of Great Plains, P.C.*, 258 Neb. 671, 676, 605 N.W.2d 777, 781 (2000). Under this test, "a defendant's conduct is a cause of an event if it was a substantial factor in bringing it about." *Id.* While a majority of the Nebraska Supreme Court has yet to apply this test in the context of a tortious interference case, it is blackletter law and followed by other states that, like Nebraska, apply the Restatement of Torts. *See Kendall/Hunt Pub. Co. v. Rowe*, N.W.2d 235, 245 (Iowa 1988); *see also Dick v. Koski Pro. Grp., P.C.*, 307 Neb. 599, 680, 950 N.W.2d 321, 378 (2020), *opinion modified on denial of reh'g*, 308 Neb. 257, 953 N.W.2d 257 (2021) (applying the Restatement (First) of Torts § 768 (1939) to a claim of tortious interference); *Macke v. Pierce*, 266 Neb. 9, 14, 661 N.W.2d 313, 317 (2003) (applying the Restatement (Second) of Torts § 766 (1979) to same).

As set forth in the First Amended Complaint, First Data intended to cause or induce the State into taking a negative view of Wipro's performance for First Data's own business interests, and it was successful in doing so. Indeed, the State was seeking to increase Wipro's responsibilities before First Data began its campaign to undermine the State's confidence in Wipro. And even if one were to infer from the pleadings that the State had an independent desire to terminate the contract—a fact not pleaded in the First Amended Complaint— the standard applicable here is not whether First Data's actions were the sole

9

cause, but whether they were a substantial factor. At a minimum, there is a question of fact as to whether First Data's actions—first in seeking to undermine the State's confidence in Wipro and then supplying a baseless progress report—were a substantial factor in the State's decision to terminate the contract and end its business relationship with Wipro.

First Data seeks to focus solely on the conduct of the State of Nebraska in August of 2018—the last days of the contract. But in its Amended Complaint, Wipro details a course of conduct by First Data beginning at least as early as April of 2018, wherein First Data violated its duty of independence with the intent of eroding the State's relationship with Wipro for First Data's own perceived benefit. [First Am. Compl. ¶¶ 26–39.] In a matter of months, First Data's breach of its duty caused the State to shift from augmenting its relationship with Wipro to terminating it.

On June 22, 2018, Wipro and the State agreed to expand their relationship through a new approach reflected in Amendment No. 5. [*Id.* at ¶¶ 32, 39.] However, just five days later, First Data's head of IV&V celebrated "planting seeds of doubt" within the State about moving forward with the project as agreed. [*Id.* at ¶ 36.] First Data also began to lay the groundwork for Wipro's termination to facilitate the State seeking an independent license to Cúram. [*Id.* at ¶ 34.] All this for the purpose of ingratiating itself to a source of future business, abandoning its duty of independence and violating general principles of government auditing.

The August 7th meeting was First Data's harvest of the "seeds of doubt" it had been planting with the State. First Data had convinced Van Patton to terminate the contract; the head of IV&V gloated over Van Patton's "willingness and dare I say plan to part with Wipro." [*Id.* ¶ 39.] Indeed, the head of IV&V later indicated that she "won the day" through deception: use of a "mask" and "wardrobe" in the style of "Kabuki" theatre. [*Id.* ¶ 39.] First Data's declaration of victory shows that First Data intended for the State to terminate the relationship.

It is also a fair inference—perhaps the only fair inference—that the State would not have terminated its relationship with Wipro without active participation by First Data in violation of its duty of independence. Van Patton may have been inclined to terminate the contract, but he was unwilling to do so without a report from First Data that Wipro's work on the MAGI portion of the project was not 80% complete as informally estimated by Wipro's project manager. [*Id.* ¶¶ 38, 39.] First Data obliged, abandoning its duty of independence, ignoring its most recent report stating that the project was on track, and using a sham test to produce a baseless report stating that MAGI was 0% complete. [*Id.* ¶¶ 44–51.]

First Data's report—and its subsequent refusal to answer questions that would permit Wipro to respond to the report—also contributed to Wipro's loss of business with the State. At a minimum, there are questions of fact as to whether First Data's conduct was a substantial factor that contributed to the

11

termination of the contract and Wipro's loss of its expectancy in future business with the State.

### 3. **Wipro has plausibly stated a claim for business expectancies in its contract with the State and its prospective economic advantage in Amendment No. 5.**

Third, First Data argues that Wipro fails to allege a valid prospective economic advantage. However, in making its case, First Data applies an inappropriate standard for a motion to dismiss and mischaracterizes the allegations in the Complaint.

To survive a motion to dismiss, Wipro must plausibly allege "the existence of a valid business relationship or expectancy." *Huff*, 258 Neb. at 825, 606 N.W.2d at 466. As First Data notes, "proving a business expectancy [is] 'valid' will generally require proof that there was a reasonable likelihood or probability of a business relationship." *GPMM, Inc. v. Tharp*, No. 8:19-CV-128, 2021 WL 392489, at *5 (D. Neb. Feb. 4, 2021). "Proof" at the pleading stage thus requires plausible allegations of that relationship or expectancy. *See id.* Wipro has pleaded exactly that, alleging an ongoing business relationship that, absent First Data's interference, was reasonably certain to continue.

Wipro "had a contract with the State of Nebraska to replace the functionality of the State's Medicaid Eligibility and Enrollment Solution with computer software." [First Am. Compl. ¶ 5.] This relationship included a new approach in Amendment No. 5 that would require Wipro's continued services into the future until completion of the Project. [*Id.* ¶¶ 32, 34–36, 39, 63.] The State only sought to terminate the relationship after First Data improperly

12

convinced the State to do so. [*Id.* ¶¶ 34, 36, 39, 43, 52.] As described above, when the State expressed a willingness to part with Wipro, First Data's head of IV&V took credit for the development. [*Id.* ¶¶ 39, 43.] Prior to this interference, Wipro had a valid relationship and expectancy in the contract and Amendment No. 5. This stands in sharp contrast to tortious interference cases that have been dismissed for "fail[ure] to allege the existence of any business relationship that was potentially impacted by [the defendant]'s conduct." *Crabar/GBF, Inc. v. Wright*, No. 8:16-CV-537, 2019 WL 4016122, at *15 (D. Neb. Aug. 26, 2019).

Despite these detailed allegations, First Data argues that Wipro had no valid expectancy of future business because the State independently sought to end its relationship with Wipro. [Def.'s Br. at 10.] However, First Data again fails to recognize Wipro's allegation that First Data's interference caused the State to reverse course and supplied the means it sought to do so.

To survive a motion to dismiss, a complaint must merely make a plausible allegation, not prove its case. *See Iqbal*, 556 U.S. at 678 (holding that on a motion to dismiss, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully"). Wipro has amply fulfilled this requirement and more than plausibly alleged a valid contract, terminated at First Data's inducement, and an expectancy that the relationship would continue had First Data not undermined it.

13

### 4. First Data's claim that it engaged in legitimate competitive activity cannot support dismissal.

Fourth, First Data tries to argue that its interference was justified as legitimate competitive activity as a matter of law. A tortious interference claim "requires an intentional act which induces or causes a breach or termination of the relationship." *The Lamar Co., LLC v. City of Fremont*, 278 Neb. 485, 497, 771 N.W.2d 894, 906 (2009). "An intentional, but justified, act of interference will not subject the interferer to liability." *Id*. An act of interference may be justified where the interferer is engaged in legitimate competition with a party to the business relationship. *Dick*, 307 Neb. at 681, 950 N.W.2d 321. However, interference is only justified as valid competition if—

> (1) the relation concerns a matter involved in the competition between the actor and the competitor, (2) the actor does not employ improper means, (3) the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his or her interest in the competition with the other.

*Id.* In this case, there was no legitimate competition because (1) First Data was not a competitor of Wipro and (2) First Data used improper means to "expand and upsell" its own line of business.

First Data was not a competitor of Wipro. It was not a software-development company. At no point do First Data or Wipro's pleadings suggest that First Data was competing for *Wipro*'s business or seeking to supplant Wipro itself. Rather, Wipro alleges that First Data undermined the relationship between Wipro and the State to promote First Data's efforts to secure additional contracts for IV&V. [First Am. Compl. ¶ 22.] Additionally, Wipro

14

alleges that First Data's interference was accomplished by wrongful means, breaching its duty to both Wipro and the State. Even if otherwise engaged in legitimate competition, "[i]f the actor employs wrongful means, he is not justified." *Keller*, 29 Neb. App. at 255, 953 N.W.2d at 826. In short, First Data's assertion that it was simply engaged in legitimate competition is not based on an accurate reading of the law.

Moreover, the ultimate determination of whether First Data's interference was justified is one of fact. At this stage, all allegations and reasonable inferences must be resolved in favor of Wipro. *See Iqbal*, 556 U.S. at 678 (factual allegations must be assumed true on a motion to dismiss). Even if First Data were considered a competitor of Wipro, First Data's interference cannot be considered justified as a matter of law. At a minimum, a reasonable finder of fact could determine that First Data's decision to abandon its independence and objectivity (a requirement of the federal scheme under which the State's project was being carried out), to promote its own financial gain, was improper and thus the basis of a valid claim of tortious interference.

**5. If the Court finds any deficiencies in the First Amended Complaint, leave to amend should be granted.**

As explained above, Wipro has more than adequately pleaded its claims of tortious interference. However, if the Court disagrees, and finds that anything is missing to support a valid claim, any problems could be cured by amendment and Wipro would respectfully request leave to do so.

## CONCLUSION

For the foregoing reasons, Wipro respectfully requests that the Court deny Defendant's Motion to Dismiss.

DATED this 15th day of September 2022.

          WIPRO, LLC, Plaintiff

By:   s/Andre R. Barry
       Richard P. Jeffries, #20089
       Andre R. Barry, #22505
       Nathan D. Clark, #25857
       CLINE WILLIAMS WRIGHT
         JOHNSON & OLDFATHER, L.L.P.
       Sterling Ridge
       12910 Pierce Street, Suite 200
       Omaha, Nebraska 68144
       T: (402) 397-1700
       F: (402) 397-1806
       rickjeffries@clinewilliams.com
       abarry@clinewilliams.com
       nclark@clinewilliams.com

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The word-count function of Microsoft Word, version 2208, states that this brief, inclusive of all text, contains 3,745 words.

          s/Andre R. Barry

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing was filed with the clerk using the Court's CM/ECF system, which will send notice of the same to all counsel of record.

          s/Andre R. Barry

4866-3262-3667, v. 2