IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WIPRO LIMITED, LLC, | |
| Plaintiff, | 4:22-CV-3116 |
| vs. | |
| FIRST DATA GOVERNMENT SOLUTIONS, LP, | MEMORANDUM AND ORDER |
| Defendant. | |

The plaintiff, Wipro Limited, LLC, brought suit against First Data Government Solutions, LP, alleging that First Data violated Nebraska common law by tortiously interfering with a valid business relationship and expectancy relating to Wipro's contract and ongoing negotiations with the State of Nebraska. Filing 11. Generally described, Wipro contracted to provide services to the State, and First Data contracted with the State to oversee Wipro's work, but Wipro alleges that First Data sabotaged Wipro's relationship with the State. *See* filing 11.

This matter is before the Court on First Data's motion (filing 17) to dismiss Wipro's operative complaint (filing 11) pursuant to Fed. R. Civ. P. 12(b)(6). The Court will deny the motion to dismiss.

I. BACKGROUND

Wipro contracted with the State of Nebraska and the federal government in 2014 to update the State's Medicaid Eligibility and Enrollment Solution software, a contract allegedly valued "into the tens of millions of dollars." Filing 11 at 2. First Data contracted with the State and federal government to manage and audit the State's contract with Wipro, and as the Independent

Verification and Validation auditor, First Data was responsible for reporting Wipro's progress. Filing 11 at 2-3; *see also* 45 C.F.R. § 95.626. Because First Data was auditing a federal government contract, First Data was bound by the generally accepted government auditing standards promulgated by the United States Government Accountability Office. 2 C.F.R. § 200.514(a).

Wipro alleges that First Data concocted a scheme to repair the "failing" relationship between the State and First Data so that First Data could "expand and upsell" its business with the State. Filing 11 at 5-6. According to Wipro, First Data developed a relationship with the Director of the Nebraska Department of Health and Human Services, Matthew Van Patton, in order to upsell its services to the State. Filing 11 at 6. To do this, First Data did "not objectively report[] the facts" in its April 2018 auditing report regarding the Cúram[1] data model portion of the project. Filing 11 at 7. First Data allegedly didn't report to the State that the Cúram model was difficult to implement in an intentional effort to undermine Wipro's work. *See* filing 11 at 7. First Data also allegedly celebrated "planting seeds of doubt" with Director Van Patton about the "Rational Team Concert" software tool that the State and Wipro agreed to use. Filing 11 at 8. Wipro appears to allege that First Data took these actions so that the State would better appreciate the value of First Data's auditing services. *See* filing 11 at 8.

On June 22, 2018, the State and Wipro agreed to amend the contract to take a new approach in implementing the work Wipro needed to complete. This agreement is referred to as "Amendment No. 5." Filing 11 at 7. Wipro alleges that Amendment No. 5 would have required additional work and additional

---

[1] "Cúram" is an IBM software platform used to administer health and social programs.

2

payment from the State. *See* filing 11 at 7, 16. Wipro began performing the work required under Amendment No. 5 but did not receive payment. Filing 11 at 7. While First Data "was ostensibly participating" with implementing Amendment No. 5, First Data was also working on obtaining an independent license to Cúram so that the State could terminate its contract with Wipro. Filing 11 at 8.

On August 7, 2018, First Data submitted its monthly report evaluating Wipro's status to the federal government, and stated Wipro was in "'green' status," meaning that Wipro was satisfactorily fulfilling its contractual duties. Filing 11 at 8-9. However, after delivering the positive report, in a meeting with Wipro and the State, First Data apparently criticized the work Wipro had completed. Filing 11 at 9. At this meeting, Wipro informally reported that it had completed 80 percent of the "MAGI" portion of the project. Filing 11 at 9. After Wipro left the meeting, the State and First Data allegedly agreed that First Data would abandon its ethical duties under 2 C.F.R. § 200.514(a) in order to provide the State with "contrived evidence to cancel" the contract with Wipro. Filing 11 at 9.

First Data then was instructed by the State to "devise a test that Wipro could not pass." Filing 11 at 9-10. On August 14, 2018, First Data sent what Wipro calls a "trap email," where it asked Wipro to provide information about the completeness of the MAGI project. Filing 11 at 10-11. Wipro provided the code base for First Data's review and provided a justification that "from a testing perspective," 80 percent "of the objectives of the MAGI portion of the project had been realized." Filing 11 at 10-11. Allegedly, Director Van Patton planned to terminate the contract with Wipro if the MAGI portion of the project was not 80 percent complete.

First Data, based on the information sent by Wipro, reported to the State that the MAGI portion of the project was 0 percent complete. Filing 11 at 12. The State allegedly used this report from First Data to justify terminating its contract with Wipro. Filing 11 at 12. On October 18, 2018, Wipro asked First Data why it reported that Wipro was 0 percent complete with the MAGI portion of the project. First Data did not respond. Filing 11 at 13.

Wipro sued the State in the Lancaster County District Court for breach of contract, promissory estoppel, and unjust enrichment. Filing 19-2. Most of Wipro's claims are still pending, but the state court dismissed Wipro's claim that the State violated the implied covenant of good faith and fair dealing. Filing 19-3 at 7. According to the state court, because the contract expressly gave the State discretion to terminate the contract with Wipro for any reason, exercising that right could not have been in bad faith. Filing 19-3 at 6.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal*, 556 U.S. at 678. Determining whether a complaint states a plausible claim for

4

relief will require the reviewing court to draw on its judicial experience and common sense. *Id*. at 679.

## III. DISCUSSION

Tortious interference with a contract and tortious interference with a prospective business relationship contain the same elements in Nebraska. *See Steinhausen v. HomeServices of Neb., Inc.*, 857 N.W.2d 816, 831 (Neb. 2015). To survive a motion to dismiss for its claims, Wipro must allege facts which would prove: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Id*. First Data does not dispute that it knew Wipro had a contract with the State. But First Data contends that Wipro has failed to allege a valid business expectancy because the contract was terminable at the State's sole discretion, so Wipro did not suffer any harm. Filing 18 at 10. First Data also argues Wipro failed to sufficiently allege that First Data's actions caused the alleged harm. Filing 18 at 11. Finally, First Data argues that if it did interfere with a valid business expectancy, its actions were justified as a competitor of Wipro. Filing 18 at 15.

### 1. BUSINESS EXPECTANCY

First Data takes issue with Wipro's ability to recover damages both for its contract with the State, and for any prospective future economic advantage represented by Amendment No. 5 to the existing contract. First Data contends that because the State could terminate the contract with Wipro at any time, for any reason, that Wipro did not have any valid expectancy. Further, First

5

Data asserts that Wipro did not have a valid prospective economic advantage because there was no guarantee that Amendment No. 5 would take effect. The Court finds that Wipro has sufficiently alleged a valid existing contract, despite its terminable-at-will nature, and that Wipro has sufficiently alleged a prospective economic advantage through its negotiations with the State.

First Data first asserts that because the State had the option to terminate its contract with Wipro at any time, for any reason, Wipro did not have any valid expectancy in its contract. But that's not the law. In determining that an at-will employee had a valid business expectancy for purposes of establishing a tortious interference claim, the Nebraska Supreme Court adopted the reasoning in the Restatement (Second) of Torts § 766 cmt. g (1979). *Huff v. Swartz*, 606 N.W.2d 461, 467 (2000). This comment provides that a contract that allows a party to terminate an agreement at will is "valid and subsisting" until the party has, in fact, terminated the contract. And just because a contract can be terminated by the parties without liability does not privilege a third party to unjustifiably induce the termination. *Id*. While the Nebraska court applied this logic in the context of an at-will employment agreement, the Restatement extends to *all* terminable-at-will contracts, and Nebraska has followed the Restatement in other tortious interference decisions. *See, e.g., Dick v. Koski Pro. Grp., P.C.,* 950 N.W.2d 321, 378 (Neb. 2020), *modified on other grounds on denial of reh'g*, 953 N.W.2d 257 (Neb. 2021). Even a terminable-at-will contract is a business expectancy protected from wrongful action by third parties such as First Data.[2]

---

[2] First Data also, incorrectly, asserts that breach of contract is a requisite element of a tortious interference claim. Filing 18 at 10. As explained above, a defendant who induces a party to terminate a contract may be liable for tortious interference, and such a termination does not have to be wrongful.

6

Related to this argument, First Data appears to assert that because the state court dismissed Wipro's claim against the State for bad faith, that Wipro's claim against First Data should also be terminated. Filing 18 at 11. The state court determined the State could not have acted in bad faith in exercising its express contractual right to terminate the contract at any time for any reason. Filing 19-3 at 5-7. However, as explained above, the State did not have to breach or wrongfully terminate the contract for Wipro to have a cause of action. First Data is not insulated from any alleged wrongdoing just because the State did not act in bad faith. The terminable-at-will provision in the contract protects the State, not First Data, so long as First Data's actions were not directed by the State. *See Huff*, 606 N.W.2d at 467.

First Data also questions whether Wipro had a prospective business expectancy because Wipro neither alleged that the State "made efforts to formalize Amendment No. 5 into a written agreement, nor that it had obtained federal authorization to effectuate any such amendment." Filing 18 at 14. However, had Amendment No. 5 been formalized, it would be a contract, not an expectancy. Although Nebraska law is not fully developed on this point, it is true that proving a business expectancy "valid" will generally require proof that there was a reasonable likelihood or probability of a business relationship. *See, e.g., Infogroup, Inc. v. DatabaseLLC,* 95 F.Supp.3d 1170, 1196 (D. Neb. 2015) (citing *Lucas v. Monroe Cnty.*, 203 F.3d 964, 978 (6th Cir. 2000); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 221–22 (Minn. 2014)). At this stage, Wipro need only allege facts which show a

---

*See Huff,* 606 N.W.2d at 467. The termination of an at-will contract is sufficient to show that a party suffered a harm which may give rise to damages, though such damages may be limited due to the nature of the at-will relationship. *See id.*

7

reasonable probability of obtaining additional business from the State. Wipro's allegations that it and the State had reached an informal agreement regarding Amendment No. 5, and that Wipro had begun the work required by Amendment No. 5, is sufficient at this stage to allow this case to proceed.

Wipro has been able to show both a valid contract and a valid business expectancy at this early stage of the proceedings. Pending a prima facie showing of the other elements—namely, causation and lack of justification—Wipro can seek damages for tortious interference with both the terminable-at-will contract it had with the State, and for any damage incurred by losing the prospective addition to the contract known as Amendment No. 5.

### 2. CAUSATION

First Data asserts that it could not have caused the State to terminate the contract because all of First Data's actions occurred at the direction of the State. Filing 18 at 12-13. A party to a contract cannot be held liable in tort for interfering with its own contract. *Huff,* 606 N.W.2d at 467. And an agent of a party cannot interfere with that contract so long as the agent acts within the "general range of his authority intending to benefit" the principal. *Id.* (quoting *Hickman v. Winston Cnty. Hosp. Bd.,* 508 So.2d 237, 239 (Ala. 1987) (quoting *Wampler v. Palmerton,* 439 P.2d 601, 607 (Or. 1968))). To be considered a third party for the purposes of a tortious interference claim, an agent's actions must be shown to have been committed in furtherance of some personal benefit, and not intended to benefit the principal. *Id.*

First Data was employed by the State to audit Wipro's performance and provide updates to the State and the federal government. Filing 11 at 2-3. Thus, First Data was an employee and an agent of the State, and any actions in furtherance of the State's objectives cannot be construed as a third party

8

interfering with the contract. According to the facts alleged in Wipro's operative complaint, after August 7, 2018, the State and First Data together developed a "plan to part with Wipro." Filing 11 at 9. Such an allegation clearly puts First Data's actions as within the "general range of authority intending to benefit" the State. *Huff,* 606 N.W.2d at 467. Wipro alleges that First Data's breach of its independence and ethical duties under the generally accepted government auditing standards created an unreasonable interference; however, even wrongful or illegal actions taken at the direction of the employer do not make the agent a "third party." *See Bussing v. COR Clearing, LLC,* No. 8:12-cv-238, 2014 WL 6997854, at *9 (D. Neb. Dec. 10, 2014). Thus, any of First Data's actions directed by and intended to benefit the State, even in violation of its ethical and legal duties under 2 C.F.R. § 200.514(a), cannot create liability under a tortious interference theory of relief.

First Data contends that Wipro failed to allege any specific actions prior to August 7, 2018, after which, according to Wipro, the State made clear its intention to terminate the contract with Wipro. However, Wipro makes two discrete allegations regarding First Data's independent actions. First, Wipro alleges that First Data failed to objectively report the complexities of the Cúram data model, and second, First Data undermined the Rational Team Concert tool used by the State and Wipro. Filing 11 at 7-8. According to Wipro, First Data was acting in its self-interest in taking these actions and wanted to "expand and upsell" its services to the State. Filing 11 at 6-8. Wipro alleges that First Data improved its chances of obtaining future contracts with the State by falsely reporting the complexities of Wipro's project, allegedly with the purpose of leading the State to question Wipro's performance of its contractual duties and reinforce the need for First Data's auditing skills.

The Court must accept Wipro's factual allegations as true, and must resolve any inferences in Wipro's favor. The facts alleged purport that but for First Data's false and misleading reports about the Cúram model and Rational Team Concert tools, the State would not have terminated its contract with Wipro. It is a reasonable inference that had First Data provided accurate reports regarding the complexities of Wipro's project for the State, the State would not have been frustrated with Wipro's performance and would not have wanted to terminate the contract. While Wipro will have the burden to prove up its assertions, it is a reasonable inference, at this stage of the proceedings, that First Data's false reports caused the State to terminate its relationship with Wipro.

### 3. COMPETITOR'S PRIVILEGE

First Data also argues that if it did interfere with Wipro's contract with the State, that such interference was not improper or unjustified because First Data is a competitor with Wipro. For an alleged interference to be actionable, it must also be improper. *Huff*, 606 N.W.2d at 467. The following non-exhaustive factors are considered in determining whether an interference is improper: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. *Id*.

However, an actor's interference with a *competitor*'s prospective or terminable-at-will business relationship is proper if: (1) the relation involves a matter of competition between the actor and the competitor, (2) the actor does

10

not employ improper means, (3) the actor does not intend to create or continue an illegal restraint of competition, and (4) at least part of the actor's purpose is to advance its interest in the competition with the other. *Koski Pro. Grp., P.C.*, 950 N.W.2d at 378; *see also* Restatement (Second) of Torts § 768 cmt a.

According to First Data's reading of Wipro's operative complaint, because First Data and Wipro were both involved in the Medicaid Eligibility and Enrollment System implementation, First Data and Wipro are competitors. Even if this were true, which Wipro contests,[3] Wipro alleges that First Data employed improper means by supplying false information to the State, and by violating ethical standards which govern government auditors. Supplying false information is clearly an improper means. *See Recio v. Evers,* 771 N.W.2d 121, 132-33 (Neb. 2009). And the violation of business ethics or customs may be significant in evaluating whether an actor's conduct was improper or not. *Koski Pro. Grp., P.C.*, 950 N.W.2d at 378 (citing Restatement of Torts § 768 (1939)).

Whether means are improper "depends upon the relation between the actor and the person induced and upon the object sought to be accomplished by the actor." *Id*. First Data argues that because a legal duty owed to a third party is not an element of a tortious interference claim, that any discussion of duty is "wholly irrelevant." Filing 23 at 2, fn1. But this is inaccurate. Whether First Data breached a duty to the *State*, and whether First Data acted in contravention of ethical or professional standards, are both relevant to

---

[3] The Court will not determine, at this point, whether Wipro and First Data are competitors for purposes of the competitor's privilege against tortious interference. More facts are needed, and Wipro will have the burden to show First Data's actions fall outside the privilege. *See Koski Pro. Grp., P.C.,* 950 N.W.2d at 378-79.

11

determining whether any interference First Data had in the State and Wipro's relationship was justified or not, even if First Data was a competitor of Wipro. *See Koski Pro. Grp., P.C.,* 950 N.W.2d at 378. As an auditor of a federal contract, First Data was required to comply with generally accepted government auditing standards, 2 C.F.R. § 200.514(a), and Wipro sufficiently alleged that First Data failed to abide by these obligations.

Based on the facts asserted by Wipro, the actions First Data took in contravention of its ethical obligation to the State fall outside of the competitor's privilege against tortious interference. With more discovery, First Data may be able to demonstrate that it did not violate its ethical duties. However, at this stage, Wipro has sufficiently alleged First Data's actions were outside the scope of the competitor's privilege, and so the case will continue.

IT IS ORDERED:

1. First Data's motion to dismiss (filing 17) is denied.

2. This matter is referred to the United States Magistrate Judge for case progression.

Dated this 4th day of November, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

12