IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WIPRO, LLC, | |
| Plaintiff, | 4:22CV3116 |
| vs. | |
| FIRST DATA GOVERNMENT SOLUTIONS, LP, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on Defendant's Motion for Summary Judgment. (Filing No. 110.) For the reasons explained below, the motion will be granted.

**STATEMENT OF FACTS**

This action arises out of a 2014 contract executed between Plaintiff and the State of Nebraska. Under the contract, Plaintiff was to serve as the systems integrator to replace the functionality of the State's Medicaid Eligibility and Enrollment System ("EES") (the "Project") with computer software that met certain criteria established by the federal government. (Filing No. 97.) Plaintiff proposed to the State that it would complete all deliverables and work product and bring the EES system live within 12 months, with an initial go-live date of December 2015. (Filing No. 113-4.) When the State awarded Plaintiff the contract, the State agreed to pay Plaintiff approximately $80 million pursuant to a fixed-bid proposal. (Filing No. 113-2.)

To obtain federal funding for the Project, the State had to hire an Independent Validation and Verification ("IV&V") contractor whose role was to provide an independent overview of progress on the Project and report to the State and federal government regarding the progress of

the Project. (Filing No. 97.) The State accepted Defendant's bid to serve as the IV&V contractor. (Filing No. 113-3.) Regina Blazek ("Blazek") was the project manager for the IV&V team. (Filing No. 97; Filing No. 123.)

Between 2014 and 2017, the Project go-live date was extended multiple times. It was extended from December 2015 to September 2016, then to April 2017, then to December 2017. (Filing No. 113-5.) During this period, the contract was also amended three times because more time was needed to complete the work. (Filing No. 113-5.)

Dr. Matthew Van Patton ("Director Van Patton") became the Director of Medicaid and Long-Term Care for the State of Nebraska in February 2018. (Filing No. 113-8.) Director Van Patton testified that he was briefed on the Project and recalled hearing concerns about Plaintiff's performance from other State employees. (Filing No. 113-8.) Director Van Patton testified that when he became director, he understood that the Project was off schedule. (Filing No. 113-8.)

In January 2018, Ruth Vineyard ("Vineyard"), the State's Deputy Director of Medicaid and Long-Term Care, emailed Nagaraj Bhogshetty ("Bhogshetty"), who was Plaintiff's Account Delivery Head, about change requests for the Project. (Filing No. 143-25; Filing No. 143-18.) Vineyard's email mentioned changing the go-live date to February 2, 2019. (Filing No. 143-25.) Around this time, Plaintiff proposed another amendment to the contract ("Amendment 5"). (Filing No. 113-7.)

On March 16, 2018, Bhogshetty requested another $7.3 million to complete the proposed Amendment 5. (Filing No. 113-4; Filing No. 113-7.) On March 26, 2018, Bhogshetty sought approval from the State to begin work under Amendment 5, and emailed Vineyard the following:

> As we discussed, as per current contract (Amendment #3) the DDI phase end date was Dec. 2017 however this has been pushed out to Feb 2019 as per proposed Amendment #5. Based on the change request proposed by the State and [Plaintiff's] response to it, we have principally agreed to work towards revised Go Live date for NTRAC which is under review and approval by the State (as attached). We continue to work on the change request while we are waiting final approval from [Centers for Medicare & Medicaid Services] and the signed document. Request you to approve the continuation of the work till we get the final signed document.

(Filing No. 113-9.) On March 28, 2018, Vineyard emailed Bhogshetty, writing "Nebraska DHHS is working in good faith with [Plaintiff] on an amendment to the existing contract that modifies

2

the project Go Live date to Feb. 2019. In addition, we are working collaboratively to realign the deliverable line items to better represent the current work effort and changes requested by the state. The undated commercial value as proposed is under review by the state and will require CMS approval." (Filing No. 113-9; Filing No. 143-26.) Vineyard testified at her deposition that she did not give approval for Plaintiff to begin work under Amendment 5 and that she did not have the authority to do so. (Filing No. 113-4.)

On or about May 15, 2018, there was a meeting of the Project's Steering Committee, which was attended by Director Van Patton. (Filing No. 113-10.) Minutes from the meeting reflect that Director Van Patton expressed that "[t]here has to be a firm production plan and schedule that can be managed." (Filing No. 113-10.) Bo Botelho ("Botelho"), the Chief Operating Officer for the Nebraska Department of Health and Human Services ("DHHS"), testified that following the meeting, the State "put a hold" on all of Plaintiff's invoices until the State could "figure out what was going on with the Project." (Filing No. 113-6.) Email correspondence between State employees during this time indicate that Director Van Patton had instructed that Plaintiff's invoices not be paid until Plaintiff provided "him with the master schedule he has requested." (Filing No. 113-12.) Director Van Patton testified that if the State was going to agree to another amendment to "a fixed-price bid [contract, for which Plaintiff was] asking for more time," he needed to be certain as to what exactly Plaintiff required to finish the Project because he "had accountability to Governor Ricketts." (Filing No. 113-8.)

By June 2018, Plaintiff's initial request for an additional $7.3 million to complete the Project had increased to $12.9 million. (Filing No. 113-6; Filing No. 113-13.) On June 15, 2018, Ashish Kumar ("Kumar"), who was Plaintiff's General Manager for Health, emailed Cat Gekas-Steeby ("Gekas-Steeby"), who was an Administrator for Policy & Communications with the State, requesting email confirmation to continue work as they sorted through the formalization of Amendment 5. (Filing No. 113-14.) Gekas-Steeby forwarded Kumar's email internally to Greg Walkin ("Walkin"), an attorney with the State, who responded to Gekas-Steeby's email, copying Botelho, stating:

> Hi, Cat, Thanks for the e- mail. They should not be doing any work that is reflected in Amendment 5. Before they can [go and] do any work that is to be reflected in amendment, and before we should even consider paying them for it, we need to

3

give it sufficient scrutiny from our end. Bo [Botelho] wants to be involved and will need to look at the final version . . . Bo [Botelho] wants us to take a very hard look.

(Filing No. 113-14; Filing No. 113-6.) By this point, the go-live date had been moved again from 2019 to April 2020. (Filing No. 113-14.)

Botelho testified that although Plaintiff submitted several iterations of a proposed amendment to the State for review, no one at DHHS had approved Amendment No. 5, nor had it been submitted to the Department of Administrative Services ("DAS") or the Centers for Medicare & Medicaid Services ("CMS") for approval. (Filing No. 113-6.) Botelho explained that the process to get an amendment approved required several layers of review. (Filing No. 113-6.) He testified that the draft amendment had to be approved by individuals at DHHS, including himself and Director Van Patton, as well as individuals from DAS. (Filing No. 113-6.) Also, any amendments required CMS approval. (Filing No. 113-6.) Botelho testified that he never approved Amendment 5 and, as of August 14, 2018, the State did not have a final-draft amendment. (Filing No. 113-6.)

On or around July 16, 2018, the State held an internal meeting about the Project. (Filing No. 143-18.) During the meeting, the State presented a PowerPoint that stated it had hired an independent consultant—Elizabeth Zamora ("Zamora") from eSystems—to "help assess [the] accuracy" of Plaintiff's representation that "MAGI configuration/development [were] 80% complete."[1] (Filing No. 113-18.) On or about August 15, 2018, Zamora issued her report to individuals with the State, including Gekas-Steeby and Chris Hill ("Hill"), who was the State's Chief Information Officer for DHHS. (Filing No. 113-8; Filing No. 143-6; Filing No. 143-19; Filing No. 143-20.) The report was also shared with Don Spaulding ("Spaulding"), who was a state staff member who had been with the Project from its inception, and Dan Gartin ("Gartin"), a state contractor for the Project. (Filing No. 113-8; Filing No. 113-6; Filing No. 113-19; Filing No. 113-20.) The report stated, in part, that Zamora was unable to determine a percentage of functionality. (Filing No. 113-19; Filing No. 113-20.)

---

[1] MAGI is the acronym for the Medicaid Adjusted Gross Income ("MAGI") component of the EES.

On August 7, 2018, shortly before Zamora issued her report, Director Van Patton asked Defendant to assess the degree of completion of the MAGI component of the Project. (Filing No. 113-8.) According to an email Blazek sent to her superiors on August 8, 2018, she attended a meeting with Director Van Patton, Kumar, and others, on August 7, 2018. (Filing No. 143-1; Filing No. 143-3.) In the email, Blazek stated that when the meeting with Plaintiff's representatives was done, Director Van Patton asked her, along with one of his DHHS employees, to stay. (Filing No. 143-3.) Blazek told her superiors that in this second part of the meeting, Director Van Patton "expressed his willingness and dare I say plan, to part" with Plaintiff. (Filing No. 143-3.) According to Blazek's email, Director Van Patton said he was "considering only allowing [Plaintiff] to only continue if in fact it can be determined that 80% [was] complete." (Filing No. 143-3.)

Blazek and IV&V team members subsequently created a document titled "IV&V EES Project Completion Status Executive Brief" ("Executive Brief"), which set forth their findings regarding the level of MAGI completion. (Filing No. 113-22.) Defendant's Executive Brief provided that there was "no evidence to support completion or to determine a percentage of completion of function to accurately determine MAGI and TMA Medicaid category eligibility at this time," and that were was no "viable integrated master schedule." (Filing No. 113-22.) Defendant's Executive Brief was given to the State on August 27, 2018. (Filing No. 113-22.)

On September 7, 2018, the State issued a cease-and-desist letter to Plaintiff directing Plaintiff to stop its work on the Project. (Filing No. 113-25.) Plaintiff thereafter requested a meeting with the State to discuss the matter. (Filing No. 113-2.) At the time of the cease and desist, Plaintiff's proposed value for Amendment 5 had grown to $28 million. (Filing No. 113-5.)

On September 14, 2018, consultant Shane Kelly ("Kelly") of JS3, sent the State a report evaluating the level of completion of Plaintiff's designs. (Filing No. 113-26.) In the fall of 2018, the State had asked Kelly to quantify the design work Plaintiff had performed. (Filing No. 113-26.) The September report provided, in part, that "the current state of the design artifacts are not considered done or consumable by development." (Filing No. 113-26.) Kelly found eight of the fourteen business functional areas had large or extra-large design efforts remaining, and nine out of fourteen business functional areas had a "level of quality" labeled as "needs work" or "insufficient." (Filing No. 113-27.)

On September 25, 2018, the State and Plaintiff met to discuss Defendant's Executive Brief and the cease and desist. (Filing No. 113-6.) No representative from Defendant was present. (Filing No. 113-6; Filing No. 113-8.) The minutes of the meeting reflect that Director Van Patton asked Plaintiff to "formally respond to the IV&V report based on which the [S]tate would re-evaluate their [c]ease and [d]esist decision." (Filing No. 113-28.) Botelho also advised Plaintiff to submit invoices for the work done up to September 7, 2018—the date of the cease and desist. (Filing No. 113-28.) At the time of this meeting, the State had not terminated its contract with Plaintiff. (Filing No. 113-2.)

On or about October 5, 2018, Plaintiff submitted its invoices for work it claimed it had done prior to issuance of the cease and desist. (Filing No. 113-36.) The State, which remained responsible for the review and payment of the invoices, refused to pay some of the invoices. (Filing No. 113-3; Filing No. 146.) It was the State's position that if work had been done by Plaintiff and met the requirements under the contract, then the State would have paid the invoices. (Filing No. 113-35; Filing No. 113-6.) Botelho testified that the decision not to pay Plaintiff was based on all information available and the State's review of the information to determine if the deliverables were in accordance with contract requirements. (Filing No. 113-6.)

In October 2018, the State asked Brad Znamenacek ("Znamenacek") and Kelly to assess the usability of non-code related artifacts. (Filing No. 113-29; Filing No. 113-31; Filing No. 148-4.) Their report provided that some deliverables were not completed as of the date the report was created. (Filing No. 113-29.) Znamenacek sent the report to Gartin on October 23, 2018. (Filing No. 148-4.)

On October 23, 2018, Plaintiff sent the State its written response to Defendant's Executive Brief. (Filing No. 113-30.) In its response, Plaintiff argued, among other things, that Defendant (1) used the wrong methodology, (2) misrepresented several key evidences, and (3) omitted key facts. Plaintiff concluded that the State should "retract the Report, withdraw the Notice, and allow [Plaintiff] to resume work on the project." (Filing No. 113-30.) Plaintiff further said that "[the State] should immediately re-initiate good faith negotiations to finalize a revised implementation and cost schedule to include in Amendment No. 5 of the Contract." (Filing No. 113-30.) Botelho testified that the State did not feel Plaintiff's response was adequate. (Filing No. 113-6.)

On November 8, 2018, eSystems reported to the State about its evaluation of the Project. (Filing No. 113-32.) In the fall of 2018, the State had engaged eSystems to review the EES document and code repositories to evaluate MAGI's level of completion, code quality, and design quality. (Filing No. 113-31.) eSystems found, in part, that: (1) the "RTC codebase might be missing developer code;" (2) the "EES design model has errors that need to be resolved and tested;" (3) in some cases, "Curam OOTB functionality was ignored and new custom code was introduced;" (4) in other cases, "Curam OOTB restricted functionality is used incorrectly;" and (5) there were "some security issues resulting from extensive use of SQL." (Filing No. 113-32.) The report also provided that the "EES program has solid foundation, that can be built upon" and that the "available Curam codebase has components that can be reused for MAGI and Non-MAGI programs." (Filing No. 113-32.)

On December 10, 2018, the State communicated its decision to Plaintiff to terminate the contract. (Filing No. 113-33.) Botelho testified that Director Van Patton and Hill eventually concluded that Plaintiff could not finish the Project, even with amendments. (Filing No. 113-6.) When asked what role Defendant's Executive Brief played in the State's decision to terminate the contract, Director Van Patton testified:

> Like I testified earlier, it wasn't a single decision made by one person. It was a group of people sitting around the table talking through lots of different considerations, and it was, you know, a universal consensus. I would tell you it was a decisioning point of consideration, but was it—was it the single driving factor? I couldn't say that with certainty. And I also couldn't and would not care to speculate as to what those others around the table were considering because they all had different perspectives, they all had different engagement points with the contractor. And, you know, they probably had other points of consideration in their decisioning.

(Filing No. 113-8.) Botelho testified that Defendant's Executive Brief "was one of the many things that we looked at that supported our concern that we would never get this done. So I would say that this Report was significant, but not the only." (Filing No. 143-20.)

After the State terminated the contract, Plaintiff sued the State in the District Court of Lancaster County, Nebraska. During that litigation, Director Van Patton was questioned about the impact Defendant's Executive Brief had on his decision of whether to stick with Plaintiff on the Project. (Filing No. 143-11; Filing No. 143-17.) Director Van Patton testified in that case that

7

Defendant's Executive Brief was "pivotal" to him. (Filing No. 143-11.) The litigation between Plaintiff and the State was ultimately resolved.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id*.

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson, 643 F.3d at 1042 (quotation omitted).

## DISCUSSION

In this suit, Plaintiff alleges Defendant tortiously interfered with its contractual relationship and prospective business relationship with the State of Nebraska. Plaintiff contends Defendant tried to "expand and upsell" its relationship with the State by planting "seeds of doubt" about Plaintiff, and that Defendant's Executive Brief was false or delivered to State officials with the understanding that it would likely result in Plaintiff's termination from the Project. (Filing No. 97.)

In support of summary judgment, Defendant argues there is no evidence that Defendant caused the State to terminate its contract with Plaintiff or otherwise interfered in Plaintiff's

relationship with the State. According to Defendant, by the time the Executive Brief was issued, the State was already dissatisfied with Plaintiff's performance and commissioned other investigators to review the status of the Project. Defendant further argues Defendant's actions did not result in any damages to Plaintiff because the State had stopped paying Plaintiff's invoices months before Defendant's Executive Brief was issued, and the State had not decided to execute additional amendments of the contract—specifically, Amendment 5.

To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Steinhausen v. HomeServices of Neb., Inc.*, 289 Neb. 927, 857 N.W.2d 816, 831 (2015).

"One of the basic elements of tortious interference with a business relationship requires an intentional act that induces or causes a breach or termination of the relationship or expectancy." *Denali Real Est., LLC v. Denali Custom Builders, Inc.*, 302 Neb. 984, 1004, 926 N.W.2d 610, 627 (2019). It must be "reasonably probable that the parties would have entered into a business relationship but for the unjustified interference." *Summit Restoration, Inc. v. Keller*, 29 Neb. App. 243, 251, 953 N.W.2d 816, 824 (2020). To show proximate cause where "multiple causes act to produce a single injury" there must be a showing that the defendant's conduct was a "substantial factor in bringing about the harm." *Remier v. Surgical Servs. Of Great Plains*, 258 Neb. 671, 677, 605 N.W.2d 777, 781 (2000). "Although the determination of causation is ordinarily a question of fact, where only one inference can be drawn, it is for the court to decide whether a given act or series of acts is the proximate cause of the injury." *Stahlecker v. Ford Motor Co.*, 266 Neb. 601, 617, 667 N.W.2d 244, 258 (2003).

As will be explained below, Plaintiff cannot establish that Defendant was the cause of the State's decision to terminate the contract, or that Defendant caused Plaintiff's financial losses. Therefore, summary judgment will be granted.

1. **Termination of the Contract**

There is no genuine dispute of material fact as to whether Defendant's conduct caused the State to terminate its contract with Plaintiff. The undisputed facts show Defendant's input about the Project, through Defendant's Executive Brief or otherwise, was simply one thing—among many—that the State considered in reaching its decision to part ways with Plaintiff. Consequently, Plaintiff cannot succeed on its tortious interference claim.

There is no question that the State had grown dissatisfied with Plaintiff's performance well before it asked Defendant to evaluate the degree of MAGI completion. Director Van Patton testified that when he became director in February 2018, he had heard concerns about Plaintiff's performance. By the time Defendant issued the Executive Brief, the Project's go-live date had been extended multiple times, the contract had been amended several times because more time was needed to complete the work, and the State had stopped paying Plaintiff's invoices. When Plaintiff was awarded the contract in 2014, it proposed that it would complete all deliverables and work product and bring the EES system live within 12 months, with an initial go-live date of December 2015. The State agreed to pay Plaintiff approximately $80 million pursuant to a fixed-bid proposal. However, by the time Plaintiff asked Defendant to evaluate the level of MAGI completion, yet another amendment to the contract had been proposed coming with an *additional* cost of $12.9 million. Also, the go-live date had been pushed to April 2020.

By July 2018, the State had undertaken its own investigation to evaluate the status of the Project. Specifically, the State engaged Zamora and eSystems to help assess the accuracy of Plaintiff's purported representation that "MAGI configuration/development [were] 80% complete." Then, in August 2018, Director Van Patton also asked Defendant to assess the degree of completion of the MAGI component of the Project. After Zamora's report and Defendant's Executive Brief were issued, the State sent Plaintiff the cease-and-desist notice. However, the State did not terminate the contract at that point. Instead, it decided to investigate further. The State met with Plaintiff's representatives (without Defendant) and asked Plaintiff to respond to Defendant's Executive Brief. The State had also commissioned additional reports from other parties regarding the status of the Project. After receiving Plaintiff's response to Defendant's Executive Brief, which Botelho considered insufficient, and having received additional

evaluations from third parties (all of whom found deficiencies with the Project), the State terminated the contract.

Plaintiff attempts to paint a picture where Defendant provided information to the State, which then directly resulted in the contract's termination. The undisputed facts belie this narrative. If, as Plaintiff argues, the State was giving Defendant's opinion decisive weight, the State would not have spoken to Plaintiff's representatives about the matter or commissioned *multiple* other reports/evaluations after receiving Defendant's Executive Brief. The State's investigation would have stopped at that point, and the contract would have been terminated. But this did not happen. The contract was not terminated until several months after Defendant's Executive Brief was issued.

The record shows that the State's independent investigation verified its concerns about the viability and status of the Project. The State's verification process utilized other sources of information, which acted to attenuate the casual link between any alleged tortious conduct by Defendant and the State's termination of the contract. The testimony is clear that the State's decision to terminate was not simply based on information received from Defendant but rather included other considerations and validations that came to light during its independent evaluation. Based on this record, Plaintiff cannot satisfy its burden to show that Defendant's actions somehow caused the termination of the contract. *See Leach v. James*, 455 S.W.3d 171, 177 (Tex. Ct. App. 2014) (stating that independent investigation undertaken by an employer "that creates or verifies basis for termination attenuates the legal nexus between the complaints instigating the investigation and the ultimate decision" where the record establishes that the employer's "decision to terminate was based upon considerations or circumstances arising from the independent investigation"). *See also American Cable Technologies Services, Inc. v. AT&T Corp.*, 140 F. Supp.2d 1026 (W.D. Mo. 2001) (finding that cancellation of a contract based on a third party's own investigation, following a complaint to the third party by defendant, did not support the plaintiff's tortious interference claim), *aff'd*, 23 Fed. Appx 625 (8th Cir. 2002).

To preclude summary judgment, Plaintiff primarily hangs its hat upon testimony from Director Van Patton in the litigation between the State and Plaintiff that Defendant's Executive Brief was "pivotal" in the decision to terminate the contract, as well as Botelho's testimony that Defendant's Executive Brief played a "significant" role. However, these individuals' word choice pertaining to the impact of Defendant's Executive Brief when taken in conjunction with their

testimony clarifying that Defendant's Executive Brief was just one piece of the State's evaluation—then coupled with the evidence that the State was conducting its own investigation both before and after issuance of Defendant's Executive Brief—does not rise to the level of creating a genuine issue of material fact as to causation.

Plaintiff also attempts to raise a factual dispute by questioning whether decisionmakers from the State ever received or reviewed the reports prepared by the other third parties. The evidence shows, however, that this information was sent to key individuals from the State, including (but not necessarily limited to) Gekas-Steeby, Hill, Spaulding, and Gartin. Further, Director Van Patton was clear in his testimony that there were multiple stakeholders in the evaluation process.  He testified these individuals had different perspectives because they had different engagement points with the contractor. Also, he testified, the decision to terminate the contract was a collective discussion and he cannot point to any one individual. (Filing No. 113-8.) Plaintiff's effort to manufacture an issue of fact by suggesting that some decisionmakers may not have been privy to all information is unavailing.  Here, the record, taken as a whole, could not lead a rational trier of fact to find for Plaintiff.  Accordingly, summary judgment is warranted.

### 2.    Invoices & Lost Profits

Plaintiff also argues that Defendant's purported interference (1) caused the State not to pay the amounts Plaintiff billed for work performed, and (2) caused Plaintiff to lose the profits it would have received had Amendment 5 been executed.  The record does not support the conclusion that Defendant caused Plaintiff to sustain any of these financial losses.

It is undisputed that the State stopped paying Plaintiff's invoices months before Defendant issued (or the State even requested) the Executive Brief.  The State stopped payment in May 2018. In September 2018, the State directed Plaintiff to submit invoices for work performed before the cease and desist was issued for review by the State. While some of these invoices were not paid, there is insufficient evidence upon which a rational jury could conclude that Defendant was the reason for this non-payment. The State was responsible for the review and payment of invoices. It was the State's position that if work had been done by Plaintiff and met contractual requirements, the invoices would have been paid.  Plaintiff's own expert in the state court litigation testified that he "found that the State repeatedly failed to provide [Plaintiff] with feedback and comments on

deliverables, failed to approve completed deliverables, and mischaracterized changes in scope as defects . . . By doing so, the State precluded acceptance and payment for work that [Plaintiff] had already performed." (Filing No. 113-16.) There is no evidence that Defendant played any role in this.

Plaintiff argues a genuine dispute of fact remains because Director Van Patton testified in the state court litigation that the State refused to pay invoices because the State had a report from Defendant questioning the validity of deliverables. (Filing No. 143-11.) However, according to Director Van Patton, by that point, the State had already began to question whether Plaintiff was competent. (Filing No. 143-11.) Also, from a timing perspective, invoices were already not being paid when Defendant's Executive Brief was issued. Further, Botelho testified that invoices were generally not paid because they did not meet contract requirements, or the State could not determine if work had been performed. (Filing No. 113-6.) Finally, by the time the unpaid invoices were submitted in October 2018, the State had gathered additional information concerning the Project, seemingly verifying the State's concerns with the Project. The record does not support the conclusion that some action on the part of Defendant caused non-payment of the invoices.

Also, Plaintiff did not have a valid expectancy to be paid for work performed under Amendment 5 prior to the suspension of the contract or for its lost profits on work it would have performed had Amendment 5 been executed. There is no dispute that a business relationship or expectancy can be created through contractual and non-contractual relationships. See *Huff v. Svchwartz.*, 258 Neb. 820, 606 N.W.2d 461 (2000). In other words, the fact that there was not a signed contract between Plaintiff and the State is not dispositive. *Buck's Inc. v. QuickTrip Corp.*, No. 8:14CV340, 2016 WL 11658959, at *4 (D. Neb. Oct. 17, 2016). However, there must have been "a reasonable likelihood or probability of a business relationship." *Id*. at *4 (quotation omitted). See also *Wash Sol., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 895 (8th Cir. 2005) ("The existence of a valid business expectancy will not be found where the facts showed a mere hope of establishing a business relationship which was tenuous."). "Liability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Mueller v. Abdnor*, 972 F.2d 931, 938 (8th Cir. 1992). "Such a rule prevents plaintiff from obtaining a windfall from a contract that might never have been performed even if the defendant had done nothing wrong." *Id*.

13

There is insufficient evidence upon which a rational juror could conclude that there was a reasonable likelihood or probability that Amendment 5 would have been executed or that Defendant's conduct was a substantial factor in the State's decision not to execute the amendment. The evidence shows that the terms of the amendment were still being negotiated when Defendant's Executive Brief was issued and that the parties never settled on a price. Amendment 5 was initially proposed to come at an additional cost of $7.3 million to the $80 million flat-rate contract. However, the increased cost for the amendment had ballooned to $28 million by the time of the cease and desist. The rising cost, coupled with the State's pre-existing concerns about Plaintiff's performance, made it unlikely (to say the least) that Amendment 5 would have ever come to fruition. While there does not need to be an official contract in place for liability for tortious interference, there must be more than a mere hope of a contractual relationship. At the time the contract was terminated, that is all Plaintiff had. This is insufficient to create a dispute of fact for purposes of summary judgment. See *Hardenberger v. Nash Finch Co.*, No. 4:14-CV-3249, 2016 WL 7469708, at *2 (D. Neb. Aug. 15, 2016) ("Inferences based upon guess or speculation do not create material issues of fact for purposes of a summary judgment.").

Plaintiff claims negotiations for Amendment 5 were nearing their final stages. This is not supported by the record. Although Plaintiff submitted several iterations of a proposed amendment for review, as of August 14, 2018, the State did not have a final-draft amendment. Also, Botelho explained that the process to get an amendment approved required several layers of review. The draft amendment had to be approved by individuals at DHHS, including himself and Director Van Patton, as well as individuals from DAS and CMS. Botelho testified that he never approved Amendment 5. Also, no one at DHHS had approved Amendment No. 5, nor had it been submitted to DAS or CMS for approval. Plaintiff points out that CMS had not rejected any prior amendments to the contract. However, it is entirely speculatory whether CMS would have done so in this case, particularly given the rising costs and extended timeline.

There is insufficient evidence upon which a jury could conclude that Plaintiff had a valid business expectancy with respect to Amendment 5 or that Defendant somehow caused the State to stop paying Plaintiff's invoices or end its business relationship with Plaintiff. Therefore, Defendant's motion for summary judgment will be granted.

Accordingly,

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Filing No. 110) is granted.

2. The motions to exclude found at Filing Nos. 99, 106, and 115 are denied as moot.

3. Judgment will be entered by separate document.

Dated this 30th day of September, 2025.

BY THE COURT:

*Susan M. Bazis*
Susan M. Bazis
United States District Judge